IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| QUINTIN-JOHN D'AGIRBAUD, III, #A0265488, | ) ) | Civil No. 20-00139 JAO-KJM |
| | ) | ORDER DISMISSING COMPLAINT |
| Plaintiff, | ) | WITH LEAVE TO AMEND |
| | ) | |
| vs. | ) | |
| | ) | |
| J. KAM, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **ORDER DISMISSING COMPLAINT WITH LEAVE TO AMEND**

Before the Court is pro se Plaintiff Quintin-John D'Agirbaud's

("D'Agirbaud") prisoner civil rights Complaint brought pursuant to 42 U.S.C.

§ 1983.  ECF No. 1.[1]  D'Agirbaud is incarcerated at the Halawa Correctional

Facility ("HCF").  He claims that the State of Hawaii Department of Public Safety

("DPS") and its employees, and Bank of Hawaii ("BOH")[2] and its employee,

---

[1]  The Court refers to the pagination assigned to filed documents by the Federal
Judiciary's Case Management/Electronic Case Files system ("CM/ECF").

[2]  D'Agirbaud names:  Public Safety Department—which the Court interprets to
mean the State of Hawaii Department of Public Safety ("DPS"), DPS Director
Nolan Espinda, Deputy Director Jodie Maesaka-Hirata, Administrator Shari
Kimoto, and Officer Monica Lortz ("DPS Defendants"); HCF Warden Scott O.
Harrington, Administrator Gary Kaplan, Unit Managers Laurie Lee-Zidek and
Monica Chun, and Adult Corrections Officers ("ACOs") Captain Edward Vaovasa,
Sergeants J. Kam and D. Sakamoto ("HCF Defendants"); OCCC Warden Francis
(continued...)

violated his civil rights under the First, Eighth, and Fourteenth Amendments during incidents that allegedly occurred at the Oahu Community Correctional Facility ("OCCC") between December 2018 through May 2019, and later at HCF, between August 2019 through January 2020.

For the following reasons, the Complaint is DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(a).  D'Agirbaud may file an amended pleading that cures the deficiencies in his pleadings and complies with this Order on or before July 20, 2020.

## I. <u>STATUTORY SCREENING</u>

The Court must conduct a pre-Answer screening of all prisoners' pleadings pursuant to 28 U.S.C. §§ 1915(e)(2) (if they are proceeding in forma pauperis) and 1915A(a) (if they allege claims against government officials).  Claims or complaints that are frivolous, malicious, fail to state a claim for relief, or seek damages from defendants who are immune from suit must be dismissed.  *See Lopez v. Smith*, 203 F.3d 1122, 1126–27 (9th Cir. 2000) (en banc); *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

---

[2](...continued)
X. Sequeira, Case Manager Muriel Keliihoomalu, Team Manager Renee Ashby, Work Furlough Administrator Wendel Yoda, and Secretary Kimberlee Kaili ("OCCC Defendants"); and BOH, and its employee Laila Mae Raquel, in their individual and official capacities (collectively, "Defendants").

Screening under §§ 1915(e)(2) and 1915A(a) involves the same standard of review as that used under Federal Rule of Civil Procedure 12(b)(6).  *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015) (citation omitted).  Under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is "plausible" when the facts alleged in the complaint support a reasonable inference that the plaintiff is entitled to relief from a specific defendant for specific misconduct.  *Id.* (citation omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at  555 (citations and footnote omitted).  The "mere possibility of misconduct" or an "unadorned, the defendant- unlawfully-harmed me accusation" falls short of meeting this plausibility standard.  *Iqbal*, 556 U.S. at 678–79 (citation omitted); *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

Pro se litigants' pleadings must be liberally construed, and all doubts should be resolved in their favor.  *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citations omitted).  The Court must grant leave to amend if it appears the plaintiff

can correct the defects in the complaint, *see Lopez*, 203 F.3d at 1130, but if a claim

or complaint cannot be saved by amendment, dismissal with prejudice is

appropriate.  *See Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1196

(9th Cir. 2013).

## II.  <u>D'AGIRBAUD'S CLAIMS</u>[3]

D'Agirbaud broadly alleges that Defendants retaliated and conspired against

him, denied him due process and medical care, subjected him to cruel and unusual

punishment at OCCC and HCF, and stole funds from his BOH account.  He sets

forth seven specific causes of action, which are only understood with reference to

his exhibits.  *See* Compl., Exs. A–C, ECF Nos. 1-2 through 1-4; *see also United

States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (allowing consideration of

"documents attached to the complaint, documents incorporated by reference in the

complaint, or matters of judicial notice" without converting a motion to dismiss

into one for summary judgment (citations omitted)).  His claims are summarized in

chronological order for clarity.

---

[3]  D'Agirbaud's statement of facts are accepted as true and construed in the light
most favorable to him.  *See Nordstrom v. Ryan*, 762 F.3d 903, 908 (9th Cir. 2014).

## A.   Counts VI and VII:  Retaliation, Due Process, and Conspiracy

DPS Director Espinda, Deputy Director Maesaka-Hirata,[4] and Officer Lortz

implemented and enforced a DPS policy that authorizes withholding 25% of

inmate income earned while in a work furlough program for payment of court-

ordered restitution.  D'Agirbaud participated in this work furlough program at

OCCC in or about mid-January through March 2019.  *See* Ex. C, ECF No. 1-4 at

12 (earnings statement); *id.* at 24.  As a condition of this program, D'Agirbaud

signed a furlough contract in which he consented to "pay 25% of ALL WAGES

earned" and $180 per month for accommodation in OCCC.  *See id.* at 2–3, 9.

Upon receiving his first check, however, D'Agirbaud refused to authorize

deductions for restitution because he asserts that the DPS policy conflicts with

//

//

//

//

//

//

---

[4]  Maesaka-Hirata is not named in either Counts VI or VII, but is described in the Complaint as involved in the work furlough program.

Hawaiʻi Revised Statutes ("HRS") §§ 353-17[5] and 353-22.6,[6] and with one of his

judgments of conviction.[7]   He claims that when he challenged this policy and

---

[5]   Section 353-17 applies to "Committed persons, *furlough*, employment," and states in pertinent part:

> (a) The director or a designated agent may grant furloughs to committed persons with a minimum or lower security classification in any correctional facility of the department for the purpose of employment, social reorientation, education, or training, or any other valid purpose as determined by the director[.]  Any moneys earned from employment by such person shall be used to satisfy a restitution order and to reimburse the State for the cost of room and board[.]
>
> (b) Full power to enforce the terms and conditions of furlough . . . is conferred upon the director or designated agent.

(emphasis added).

[6]   Section 353-22.6, "Victim restitution," states:

> The director of public safety shall enforce victim restitution orders against all moneys earned by the inmate or deposited or credited to the inmate's individual account while incarcerated.  Notwithstanding any law or order to the contrary, the amount deducted shall be twenty-five per cent of the total of all moneys earned, new deposits, and credits to the inmate's individual account. The moneys intended for victim restitution shall be deducted monthly and paid to the victim once the amount reaches $25, or annually, whichever is sooner.  This section shall not apply to moneys earned on work furlough pursuant to section 353-17.

[7]   *See* Ex. C, ECF 1-4 at 6 (judgment in Cr. No. 02-1-1336 (Haw. 1st Cir. Ct.), ordering "*at least* 10% of expendable income" from employment to be paid for restitution (emphasis added)).

6

refused to authorize these deductions, Defendants Lortz, Keliihoomalu, Ashby, Yoda, and Sequeira retaliated against him by removing him from the work furlough program, finding him guilty of a false misconduct violation,[8] and transferring him to HCF.  He further alleges that they conspired with Defendants Kaili, BOH, and BOH employee Raquel to deduct four restitution payments from his account *after* he was removed from the work furlough program.

D'Agirbaud alleges this violated his rights under the First and Eighth Amendments and state law and caused the Hawaii Paroling Authority ("HPA") to deny him parole in July 2019.

## B.    Counts I and II:  Failure to Protect

In August 2019, several months after D'Agirbaud arrived at HCF, Defendants Kaplan and Lee-Zidek housed a closed custody, convicted sex offender with D'Agirbaud.  Compl., ECF No. 1 at 10 (Count I).  D'Agirbaud claims that, in housing him with this alleged sex offender, Kaplan and Lee-Zidek failed to follow a DPS housing policy that requires inmates to be identified, screened, and housed under Prison Rape Elimination Act ("PREA") guidelines to prevent sexual assaults in prisons.  *Id.*; *see also* Ex. A, ECF No. 1-2 at 8–10.  He alleges that Kaplan and

---

[8]  D'Agirbaud allegedly told another inmate that he would or could have him fired from the work furlough program.

Lee-Zidek failed "to take prompt reasonable remedial action to protect" him from assault by this inmate.  Compl., ECF No. 1 at 10.

D'Agirbaud alleges that on October 29, 2019, this cell mate locked their cell door and "violently sexually assaulted" him.  *Id.* at 11 (Count II).  D'Agirbaud screamed "get this faggot rapist off of me," Ex. A, ECF No. 1-2 at 3, "[y]ou think it's funny what this serial rapist did to me?" *id.* at 5, and "this sex offender raped me [and] you laugh?"  *Id.* at 6.  D'Agirbaud's cell mate left the cell and reported a "concoct[ed] story" to Sergeant Kam.  Plaintiff contends that Defendant Kam called him down into the office with the inmate who raped him present, immediately blamed D'Agirbaud for the incident, and told Plaintiff that because he was the "floor-boy," he "ha[d] to get along with everybody."  *Id.* at 11.  Plaintiff became "[i]ncensed" and reported that "he was just raped by that evil man right there!" upon which Kam ordered Plaintiff back to his cell.  *Id.*  According to Plaintiff, Kam did not take a statement from Plaintiff and refused to either write a PREA report or call the police.  Kam moved the cell mate to another cell in the same Module.  *See id.*  Plaintiff alleges that Kam negligently failed to "safely house/rehouse [him] and properly investigate his claims," violating the Eighth Amendment.  *Id.*

## C.      Count III:  Retaliation

The next morning, on October 30, 2019, D'Agirbaud reported the alleged sexual assault to Sergeant Sakamoto.  Defendant Sakamoto told D'Agirbaud that Kam had left instructions to remove him from his job as a "floor-boy."  Kam allegedly wrote a fictitious report that D'Agirbaud had refused to move to a new cell[9] and had threatened his cell mate's safety by revealing his sexual offender status to the other inmates.  *Id.* at 12.

That afternoon, ACO Flores told D'Agirbaud to change cells; D'Agirbaud complied and then went to a class.  When he returned from class Sergeant Kam handcuffed him and moved him to the high security special housing unit ("SHU") based on Kam's allegedly false misconduct report.  D'Agirbaud claims that Kam acted in retaliation, violating his rights under the First Amendment, which resulted in the denial of parole in February 2020.

---

[9]  D'Agirbaud was originally charged with refusing to obey an order of a staff member when it was recommended that he be moved to the high security special housing unit ("SHU").  *See* Ex. A, ECF No. 1-2 at 2 (DPS Administrative Segregation Form, authorized and signed by Captain Vaovasa).  But D'Agirbaud was neither formally charged nor found guilty of this misconduct.  *Id.* at 4 (Notice of Report of Misconduct and Hearing; charging D'Agirbaud only with threatening his cell mate).

**D.    Count IV:  Denial of Medical Care**

D'Agirbaud was not taken to the HCF infirmary until November 1, 2019, where he reported the alleged sexual assault.  *See* ECF No. 1 at 13.  The duty nurse notified a lieutenant, who called the Honolulu Police Department ("HPD") and provided D'Agirbaud a PREA form to complete.  An HPD Officer took D'Agirbaud's statement and allegedly charged his cell mate with sexual assault. D'Agirbaud says Defendants Warden Harrington and Kam nonetheless charged *him* with misconduct for revealing his cell mate's sexual offender status.  D'Agirbaud alleges that Harrington and Kam "violated P.R.E.A. protocol" when they failed to isolate his cell mate immediately after the alleged assault, to preserve evidence, or provide him medical attention after he reported the alleged assault.  *Id.*  He says this violated the Eighth Amendment and resulted in the denial of parole in February 2020.

**E.    Count V:  Due Process**

On or about November 8, 2019, Unit Manager Chun conducted D'Agirbaud's disciplinary proceeding regarding the charge that D'Agirbaud threatened his cell mate's safety.  *See* ECF No. 1 at 14.  D'Agirbaud says that Defendant Chun's refusal to allow him to review the reports about the charges hindered his ability to defend himself.

Chun found D'Agirbaud guilty of threatening his cell mate, and he grieved this decision.  On January 30, 2020, Administrator Kimoto upheld Chun's decision and denied D'Agirbaud's final grievance.  D'Agirbaud alleges this violated his Fourteenth Amendment right to due process and resulted in the denial of parole in February 2020.

## III.  DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege:  (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Naffe v. Frey*, 789 F.3d 1030, 1035–36 (9th Cir. 2015) (citing *id.*).

Section 1983 requires an actual connection or link between a defendant's actions and the plaintiff's alleged deprivation.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978); *Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976); *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) (citation omitted).

11

Thus, a plaintiff must allege that he suffered a specific injury as a result of a particular defendant's conduct and he must affirmatively link that injury to the violation of his rights.

## A.   Misjoinder

Rule 18(a) of the Federal Rules of Civil Procedure allows a plaintiff to join as many claims as he has against an opposing party in one suit.  Fed. R. Civ. P. 18(a).  But parties may be joined as defendants in one action only "if . . . any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2); *see Coughlin v. Rogers*, 130 F.3d 1348, 1350–51 (9th Cir. 1997); *see also George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("Unrelated claims against different defendants belong in different suits[.]" (citation omitted)).

In Counts I to V, D'Agirbaud alleges that HCF Defendants Harrington, Kaplan, Lee-Zidek, Chun, Kimoto, Kam, Sakamoto, and Vaovasa[10] failed to protect him from assault, denied him medical care, falsely charged him with misconduct,

---

[10]  Captain Vaovasa is not named in Counts I through V, but his name appears in a document attached to the Complaint and relevant to these counts.

and denied him due process during disciplinary proceedings at HCF between August 2019 and January 2020.

In Counts VI and VII, D'Agirbaud alleges that DPS Defendants Espinda, Maesaka-Hirata, and Lortz; OCCC Defendants Sequeira, Keliihoomalu, Ashby, Kaili, and Yoda; and BOH Defendant Raquel conspired to violate his rights under state and federal law and retaliated against him between December 2018 and May 2019.  He claims they implemented and enforced a policy that allegedly violates state law, falsely charged him with a misconduct violation, removed him from OCCC's work furlough program for challenging the policy, deducted funds from his BOH account without his permission, and transferred him to HCF.

These Defendants and claims are improperly joined under Rules 18(a) and 20(a).  D'Agirbaud's allegations against DPS, OCCC, and BOH Defendants, relating to the OCCC work furlough program, withdrawal of funds, misconduct report, and transfer from OCCC to HCF are separated by time, facilities, alleged motivations, and questions of law and fact from those against HCF Defendants regarding the alleged failure to protect him from a sexual assault, denial of medical care, and misconduct charges.[11]

---

[11]  D'Agirbaud vaguely alleges Defendants engaged in a grand conspiracy against him, but this conclusory allegation is not evident from his statement of facts.

If unrelated claims are improperly joined, the court may dismiss or sever them without prejudice.  *See* Fed. R. Civ. P. 21; 7 Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1684 (3d ed. 2012); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) (affirming dismissal of certain defendants under Rule 21 when claims against them did not arise out of the same transaction or occurrences, as required by Rule 20(a)). If the Court decides to "dismiss rather than sever [claims, it] must conduct a prejudice analysis, including 'loss of otherwise timely claims if new suits are blocked by statutes of limitations.'"  *Rush v. Sport Chalet, Inc.*, 779 F.3d 973, 975 (9th Cir. 2015) (quoting *DirecTV, Inc. v. Leto*, 467 F.3d 842, 846–47 (3d Cir. 2006) (other citation omitted)).

D'Agirbaud's claims against DPS and OCCC Defendants are based on incidents that occurred at OCCC between December 2018 and May 2019.  His claims against HCF Defendants are even more recent, allegedly occurring between August 2019 and January 2020.  There is little danger that he will be prejudiced by any statute of limitation on these claims.[12]  The Complaint also fails to meet the "short and plain statement" requirements of Rule 8 of the Federal Rules of Civil

---

[12] The two-year "'general' personal injury" limitation period in HRS § 657-7 applies to § 1983 actions in Hawaiʻi.  *Pele Defense Fund v. Paty*, 73 Haw. 578, 597–98, 837 P.2d 1247, 1260 (1992) (emphasis omitted).

Procedure.  *See* Fed. R. Civ. P. 8(a).  Dismissing the Complaint with leave to amend

allows D'Agirbaud to decide which *related* claims he will pursue in *this* action, and

which claims he will bring in a new action, with the benefit of the Court's analysis

of his claims in light of the legal standards below.  Accordingly, the Complaint is

DISMISSED with leave granted to amend.

**B.      Eleventh Amendment Immunity**

"The Eleventh Amendment bars suits for money damages in federal court

against a state, its agencies, and state officials acting in their official capacities."

*Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007) (citations

omitted); *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–03

(1984); *Flint v. Dennison*, 488 F.3d 816, 824–25 (9th Cir. 2007).  Official capacity

defendants are subject to suit under § 1983 only "for prospective declaratory and

injunctive relief . . . to enjoin an alleged ongoing violation of federal law."  *Oyama*

*v. Univ. of Haw.*, Civ. No. 12-00137 HG-BMK, 2013 WL 1767710, at *7 (D. Haw.

Apr. 23, 2013) (quoting *Wilbur v. Locke*, 423 F.3d 1101, 1111 (9th Cir. 2005),

*abrogated on other grounds by Levin v. Commerce Energy Inc.*, 560 U.S. 413

(2010)); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A]

suit against a state official in his or her official capacity is not a suit against the

official but rather is a suit against the official's office." (citation omitted)); *Ex parte Young*, 209 U.S. 123, 159–60 (1908).

D'Agirbaud's removal from the work furlough program and transfer to HCF moots his official capacity claims for prospective injunctive relief regarding conditions of confinement at OCCC. *See Pride v. Correa*, 719 F.3d 1130, 1138 (9th Cir. 2013) ("When an inmate challenges prison conditions at a particular correctional facility, but has been transferred from the facility and has no reasonable expectation of returning, his [injunctive] claim is moot." (citation omitted)). To the extent that he asserts a claim for prospective injunctive relief challenging the work furlough program's deductions on behalf of other inmates, as a pro se litigant he has no right to assert claims on behalf of others. *See Simon v. Hartford Life, Inc.*, 546 F.3d 661, 664 (9th Cir. 2008) (noting the well established right to represent oneself in federal court under 28 U.S.C. § 1654 is "personal to the litigant and does not extend to other parties"). Nor does D'Agirbaud allege that he remains in danger from the incidents at HCF, that is, his alleged assault by his cell mate or proceedings thereafter relating to his misconduct violation.

Accordingly, D'Agirbaud's claims for prospective injunctive relief and for damages against individual Defendants named in their *official* capacities are

DISMISSED with prejudice.[13]  Further, because DPS is a state agency and is not a "person" within the meaning of § 1983, claims against DPS are DISMISSED with prejudice.  This does not prevent him from seeking damages against Defendants named in their individual capacities.

## C.  Eighth Amendment

D'Agirbaud alleges Defendants violated the Eighth Amendment when they (1) failed to protect him from sexual assault by his roommate (Counts I and II); (2) denied him medical care after the alleged assault (Count IV); and (3) removed him from the OCCC work furlough program and transferred him to HCF (Counts VI and VII).[14]

The Eighth Amendment protects prisoners from inhumane methods of punishment and inhumane conditions of confinement.  *See Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Extreme deprivations are required to state a conditions-of-confinement claim, and "only those deprivations denying the minimal civilized measure of life's necessities" will support an Eighth Amendment

---

[13]  This does not prevent D'Agirbaud from seeking damages against Defendants named in their individual capacities.

[14]  Plaintiff alleges theft by some of the Defendants as an Eighth Amendment violation.  As discussed below, the Court treats this allegation as a Due Process violation.

violation.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted).

"Prison officials have a duty to ensure that prisoners are provided adequate shelter,

food, clothing, sanitation, medical care, and personal safety."  *Johnson v. Lewis*,

217 F.3d 726, 731 (9th Cir. 2000) (citations omitted).

To state an Eighth Amendment claim, an inmate must show that:  (1) "the

deprivation alleged [is] objectively, 'sufficiently serious;'" and that (2) the prison

official had a "'sufficiently culpable state of mind,'" that shows "'deliberate

indifference' to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834

(1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991)) (other citations

omitted).  The "official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the

inference."  *Id.* at 837.

### 1.     Removal from Work Furlough and Transfer to HCF

D'Agirbaud broadly alleges that his removal from the OCCC work program

and transfer to HCF subjected him to cruel and unusual punishment.  *See* Compl.,

ECF No. 1 at 16 (Count VII).  He alleges no facts from which the Court can

plausibly infer that these actions subjected him to cruel and unusual punishment or

deprived him of the minimal measure of life's necessities.  This allegation is wholly

unsupported and fails to state a colorable claim for relief.

## 2.    Failure-to-Protect

"[P]rison officials have a duty to protect prisoners from violence" because "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 833–34 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (alterations and other citations omitted); *see Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).

A prison official need not "believe to a moral certainty" that an inmate is at risk of harm "before [he] is obligated to take steps to prevent such an assault," but "he must have more than a mere suspicion that an attack will occur." *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citation omitted).  "[S]peculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm to [an inmate's] future health." *Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir. 2007) (citation omitted).  The obviousness of the risk may be sufficient to establish knowledge.  *See Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).  The prisoner may demonstrate that the risk was obvious due to the prisoner's personal characteristics or conditions within the prison.  *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)

### a.   Defendants Kaplan and Lee-Zidek

D'Agirbaud alleges Kaplan and Lee-Zidek failed to check the Offendertrak database or use the "PREA Screening Tool Instructions" ("PSTI") when they housed his cell mate with him, leading to his assault.  *See* Ex. A, ECF No. 1-2 at 8–11.  The PSTI is designed to protect inmates who are known or potential victims from being housed with inmates who are known or potential "sexual predators." *Id.* An inmate is designated as a known sexual predator if he has an adjudicated history of sexual abuse in a  correctional setting.  An inmate is designated as a potential predator if he satisfies three of the following four factors:  (1) he is an adjudicated sexual offender outside of prison; (2) he has a history of criminal, physical abuse within the past five years outside of prison; (3) he has a history of violence in a correctional setting within the past five years; and (4) he has a current, confirmed gang or "Security Threat Group affiliation. *See id.* at 8–9.  Prison officials have discretion to override a sexual predator designation under the PSTI.

D'Agirbaud does not provide the PSTI criteria for designating an inmate as a potential victim, but he claims that he fits this category because he has filed two suits against the DPS or its employees.  He does not identify either suit within his asserted counts, but states that he filed the first in 2015 for an alleged sexual assault

by a prison employee.  This suit has settled.[15]  The second suit challenges DPS's

policy of housing close custody inmates with general population inmates and

remains pending.[16]

First, D'Agirbaud does not allege how he knows that Kaplan and Lee-Zidek

failed to check Offendertrak or follow the PSTI; he only speculates that they failed

to follow protocol.  Even if true, and accepting that D'Agirbaud's cell mate was an

adjudicated sexual offender outside of prison, these facts alone do not dictate that

he must be designated as a known or potential sexual predator under the PSTI

because D'Agirbaud alleges no facts showing that his cell mate satisfied the *other*

PSTI criteria for such a designation.

Second, D'Agirbaud does not explain why his *civil* suits against DPS

officials would be logged into Offendertrak, or why filing civil suits against prison

officials, regarding which he does not allege that he prevailed on a claim that they

---

[15]  In the form complaint completed by D'Agirbaud, he identifies only two prior
lawsuits in the section titled, "Previous Lawsuits."  Compl., ECF No. 1 at 8.  One
is a pending case in federal court filed in 2018; the other is Case No. 16-1-0454-03
filed in 2016 in the "First Circuit Court of Hawai'i" based on a claim of "sexual
assault by staff," which "settled."  *Id.*  The Court interprets D'Agirbaud's reference
in Count I to a "sexual assault complaint by staff in 2015" to the 2016 case filed in
the Circuit Court of the First Circuit.

[16]  He apparently refers to *D'Agirbaud v. Alanzo*, No. 1:18-cv-000021 JMS-WRP
(D. Haw.), in which D'Agirbaud alleges the defendants failed to protect him from
specific "USO" gang members from whom he sought protective custody.

failed to protect him from sexual assault, is a PSTI factor for identifying potential victims.  To be clear, D'Agirbaud does not allege that he was sexually assaulted in Civ. No. 1:18-cv-00021, he alleges that he was assaulted by gang members from whom he had separatee status.  Nor does he explain under what conditions his state court lawsuit settled.  Significantly, D'Agirbaud does not allege that he ever alerted any HCF prison official in 2019 that he feared his cell mate would sexually assault him during the two to three months before the assault occurred.  He clearly knew, however, that his cell mate was a convicted of sexual assault *before* the alleged sexual assault occurred and he revealed the cell mate's status.

D'Agirbaud alleges insufficient facts for the Court to plausibly infer that Kaplan and Lee-Zidek had more than a mere suspicion that he would be endangered if they housed the cell mate with him.  He therefore fails to state a colorable claim for relief against Kaplan or Lee-Zidek.

### b.    Warden Harrington

Supervisory officials are not liable under § 1983 for the actions of their subordinates "on any theory of vicarious liability."  *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (citation omitted).  A supervisor may be individually "liable under § 1983 so long as 'there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

between the supervisor's wrongful conduct and the constitutional violation.'"
*Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting
*Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018)).

A causal connection can be shown by the supervisor's:  (1) "own culpable
action or inaction in the training, supervision, or control of subordinates"; (2)
"acquiescence in the constitutional deprivation" about which a complaint is made;
or (3) "conduct that showed a reckless or callous indifference to the rights of
others."  *Id.* (citation omitted); *see Henry A. v. Willden*, 678 F.3d 991, 1004 (9th
Cir. 2012).  Liability may also be imposed "if supervisory officials implement a
policy so deficient that the policy itself is a repudiation of constitutional rights and
is the moving force of a constitutional violation."  *Crowley*, 734 F.3d at 977
(quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal quotation
marks omitted).  "[G]eneral responsibility for supervising the operations of a prison
is insufficient to establish personal involvement."  *Ouzts v. Cummins*, 825 F.2d
1276, 1277 (8th Cir. 1987) (citation omitted).

D'Agirbaud alleges that Warden Harrington "directly and intentionally
ignored P.R.E.A. protocol and allowed his agents, Kaplan and Lee-Zidek" to house
a sexual offender with him.  Compl., ECF No. 1 at 4.  First, "there is no private
cause of action available to vindicate violations of the PREA."  *Hatcher v.*

23

*Harrington*, No. 14-00554 JMS/KSC, 2015 WL 474313, *5 (D. Haw. Feb. 5, 2015)

(concluding that PREA does not create a private cause of action and collecting

cases).  To the extent D'Agirbaud seeks relief against Harrington or any other

Defendant under PREA, he fails to state a claim.

Second, D'Agirbaud alleges no facts suggesting that Harrington had any

personal involvement in this housing assignment, or knowledge of its alleged

impropriety, or even a suspicion that D'Agirbaud was particularly vulnerable or

feared for his safety from this inmate.  He does not allege that Harrington directed

Kaplan and Lee-Zidek to ignore housing protocol, or that he implemented a

constitutionally deficient housing policy that failed to protect inmates from assault.

Rather, D'Agirbaud alleges that Kaplan and Lee-Zidek *ignored* a DPS policy

requiring them to check Offendertrak and use the PSTI for housing assignments.

D'Agirbaud alleges liability against Harrington based only on his general

responsibility for supervising HCF operations.  This is insufficient to state a

colorable claim against Harrington.

### c.    Sergeant Kam

D'Agirbaud alleges that Kam failed to protect him *after* he told Kam that his

cell mate had sexually assaulted him.  He claims that Kam refused to call the police

or write a PREA report and "failed to take prompt and reasonable remedial action to

protect Plaintiff."  Compl., ECF No. 1 at 11.  Whether Kam wrote a report that

night or refused to call the police is immaterial to whether he failed to protect

D'Agirbaud from further assault by the cell mate because D'Agirbaud

unequivocally states that Kam immediately moved his cell mate to another cell

when he learned about the alleged assault that evening, and that D'Agirbaud was

removed from the Module the next day.  D'Agirbaud fails to state a failure-to-

protect claim against Kam.

### 3.    Denial of Medical Care

D'Agirbaud claims that Kam and Harrington failed to provide him medical

care after the assault occurred for approximately two days.  To prevail on a claim

for the denial of medical care, a prisoner must demonstrate that a defendant acted

with "deliberate indifference to [his] serious medical needs."  *Jett v. Penner*, 439

F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104

(1976)).

First, "[a] serious medical need exists if the failure to treat a prisoner's

condition could result in further significant injury or the 'unnecessary and wanton

infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992)

(citation and internal quotation marks omitted), *overruled on other grounds by*

*WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).  "The existence of

an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" are examples of serious medical needs. *Id.* at 1059–60 (citations omitted). Thus, an allegation of rape qualifies as a "serious medical need."

Next, deliberate indifference by a prison official in responding to a "serious medical need" is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and . . . harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060). Further, the prison official must know of and disregard an excessive risk to a prisoner's health. *See Farmer*, 511 U.S. at 837 (rejecting an objective test for deliberate indifference).

### a.   Sergeant Kam

D'Agirbaud does not allege that he asked Kam to send him to the medical unit on the night of the alleged assault and Kam refused. However, he says that he told Kam that he was "just raped" by his cell mate, and he alleges that he suffered "serious personal injuries" and "physical pain and mental distress" from Kam's failure to respond. Compl., ECF No. 1 at 11. Construing this in the light most favorable to D'Agirbaud, and at the screening stage, this states a colorable claim for relief against Kam.

### b.   Warden Harrington

D'Agirbaud again fails to show that Harrington had any personal involvement in the alleged denial of medical care.  He was taken to the medical unit three days after the alleged assault, where he reported the assault to the police.  On November 14, 2019, Harrington notified D'Agirbaud that he was being charged with threatening his cell mate.  He does not allege that Harrington knew that D'Agirbaud had asked for medical care and was denied, or that Harrington instituted a policy that somehow authorized Kam's alleged inaction or otherwise denied medical care to inmates who allege they have been sexually assaulted. D'Agirbaud fails to state a claim for the denial of medical care against Harrington.

### D.   Due Process

D'Agirbaud alleges that he was denied due process when (1) OCCC Defendants removed him from the work furlough program, accepted false allegations against him made by another inmate, transferred him to HCF, and withdrew restitution payments from his account without his consent;[17] (2) Sergeant

---

[17]  Although D'Agirbaud alleges these claims violated the Eighth Amendment, the Court reviews them under the Due Process Clause.  This is because the Court has already reviewed under the Eighth Amendment the issue of removal from the work furlough program and transfer to HCC, *see supra* Part III.C., and what remains is D'Agirbaud's claim that restitution payments were wrongly withdrawn from his account.  *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular

(continued...)

27

Kam falsely charged him with disobeying an order to change cells; (3) Chun denied

him the prison's reports at the disciplinary hearing; and (4) Kimoto denied his

grievance.  *See* Compl., ECF No. 1 at 14–16.

   To state a due process violation, a plaintiff must first establish a liberty or

property interest for which protection is sought.  Liberty interests may arise from

the Due Process Clause itself or from state law.  *See Wilkinson v. Austin*, 545 U.S.

209, 221 (2005) (citations omitted); *Hewitt v. Helms*, 459 U.S. 460, 466–68 (1983),

abrogated in part on other grounds by *Sandin v. Conner*, 515 U.S. 472, 481–84

(1995); *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013) (citation

omitted).  If no protected liberty interest is at stake, no process is required.  *See,*

*e.g.*, *Wilkinson*, 545 U.S. at 221; *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454,

459–60 (1989) (citations omitted); *Meachum v. Fano*, 427 U.S. 215, 223–24

(1976); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).  "[A]s long as the

conditions or degree of confinement to which the prisoner is subjected is within the

sentence imposed upon him and is not otherwise violative of the Constitution, the

Due Process Clause does not in itself subject an inmate's treatment by prison

_____

[17](...continued)
Amendment 'provides an explicit textual source of constitutional protection'
against a particular sort of government behavior, 'that Amendment, not the more
generalized notion of 'substantive due process,' must be the guide for analyzing
these claims." (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

authorities to judicial oversight." *Montayne v. Haymes*, 427 U.S. 236, 242 (1976); *Hewitt*, 459 U.S. at 468 (quoting *id.*).

A state-created liberty interest may arise through state statutes, prison regulations, and policies. *See Chappell*, 706 F.3d at 1063 (citations omitted). But state liberty interests must be of "real substance," meaning freedom from restraint that (1) imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or (2) "will inevitably affect the duration of [a] sentence." *Sandin*, 515 U.S. at 478, 484, 487 (citation omitted).

### 1.     No Liberty Interest

D'Agirbaud has no direct liberty interest in remaining at OCCC, in participating in the work furlough program, or in employment while in prison. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (stating prisoners have no liberty interest in a particular classification status or rehabilitation); *see also Olim v. Wakinekona*, 461 U.S. 238, 244–48 (1983) (holding prisoners have no right to remain in prison of choice or prevent a transfer, even to a facility outside a prisoner's home State).

He also has no freestanding "right to be free from false accusations." *Garrott v. Glebe*, 600 F. App'x 540, 545 (9th Cir. 2015) (citations omitted); *see Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989) (explaining that claims based on false

charges and defendant's involvement in the grievance procedure, "standing alone, do not state constitutional claims" (citation omitted)); *Shepherd v. Nueschmid*, No. 2:19-cv-0084 JAM DB P, 2019 WL 1229773, at *7 (E.D. Cal. Mar. 15, 2019) (same). Further, OCCC Defendants did not make false allegations against D'Agirbaud, rather, after an investigation they found another inmate's claims that D'Agirbaud had sexually harassed him and threatened his job were credible.

Further, although Kam told Officer Sakamoto to remove D'Agirbaud from his job because he had refused to change cells, which D'Agirbaud alleges is untrue, D'Agirbaud was found guilty only of threatening his cell mate by revealing his sex offender status to the other inmates. *See* Ex. A, ECF No. 1-2 at 4 (Notice of Misconduct Report and Hearing).[18] D'Agirbaud, however, admits that he revealed that his cell mate was a convicted sex offender to other inmates during the alleged assault and later, when he argued with Kam at the control post, because he was incensed and upset.[19] He disagrees that this constituted a threat or that his statements put his cell mate in danger because his cell mate was physically

―――――――――――

[18] D'Agirbaud was found guilty of violating DPS "13.03.5.0.3a-7(2)- Threatening another person, other than a correctional worker, with bodily harm, or with any other offense against the person or the person's property." Ex. A, ECF No. 1-2 at 4.

[19] *See* Ex. A, ECF 1-2 at 3, 5, 6.

imposing and said he did not feel threatened.  Nonetheless, prison officials held that D'Agirbaud's statements could have placed his cell mate in jeopardy and constituted a threat.

"Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."  *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").  Thus, OCCC Defendants' and Chun's findings that D'Agirbaud was guilty of misconduct violations at OCCC and HCF, and Kimoto's rejection of D'Agirbaud's appeal, without more, do not serve as a basis for § 1983 liability.  *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (stating prisoners have no "separate constitutional entitlement to a specific prison grievance procedure" (citation omitted)); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure."); *see also Todd v. Cal. Dep't of Corr. & Rehabilitation*, 615 F. App'x 415, 415 (9th Cir. 2015) (same).

To the extent that D'Agirbaud complains that his misconduct violations prevented his early release on parole, he fails to state a claim.  Hawai'i inmates have no direct or state-created liberty interest in release before the expiration of their

sentences. *See Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *Mujahid v. Apao*, 795 F. Supp. 1020, 1024 (D. Haw. 1992) (holding same under Hawaiʻi law); *Rideout v. Haw. Paroling Auth.*, Civil No. 14-00104 SOM-BMK, 2014 WL 1571286, at *3 (D. Haw. Apr. 17, 2014) (recognizing that Hawaii's parole regime creates no liberty interest in parole and collecting District of Hawaii cases).

D'Agirbaud alleges no facts suggesting that he was subjected to "atypical and significant hardship" at OCCC or HCF, or showing that either misconduct charge will affect the duration of his sentence. *See Sandin*, 515 U.S. at 477–87. That is, he makes no comparison of the duration and intensity of his conditions of confinement at HCF or in the SHU to those imposed on inmates in administrative segregation and protective custody, i.e., inmates in analogous discretionary confinement settings, to show that he was subjected to atypical or significant hardship. *See Chappell*, 706 F.3d at 1064–65 (applying factors elucidated in *Sandin*) (citations omitted). Thus, he fails to plausibly allege that he had a state-created liberty interest for which he was denied due process.

Finally, even if D'Agirbaud could identify a liberty interest, he fails to show any due process violation. Under *Wolff v. McDonnell*, an inmate must receive (1)

written notice of the violation twenty-four hours before any hearing regarding the violation; (2) an impartial factfinder; (3) a written statement of the evidence the factfinder relied on and the reasons for the disciplinary action; and (4) the option to call witnesses when this will not jeopardize institutional security and to present evidence.  418 U.S. 539, 556, 563–66, 571(1974).  D'Agirbaud received each of these procedural protections.  *See* Ex. A, ECF No. 1-2, at 4 (Notice of Report of Misconduct and Hearing, acknowledging notice of the charge and hearing, no objection to committee, and providing statement of evidence and reasons for discipline).  D'Agirbaud complains only that he was not provided with written reports relating to the HCF charge.  He does not have a due process right to such reports nor does he explain what purpose they would have served.  He was charged with threatening his cell mate by revealing his sexual offender status and he admitted to doing so.

### 2.    Property Interest

D'Agirbaud alleges Defendants "stole" his funds when they authorized the withdrawal of four restitution payments from his BOH account, allegedly without his consent.  The Due Process Clause protects prisoners from being deprived of property without due process of law.  *See Wolff*, 418 U.S. at 556.  An authorized, intentional deprivation of property is actionable under the Due Process Clause.  *See*

*Hudson v. Palmer*, 468 U.S. 517, 532 (1984)) (citations omitted).  An authorized deprivation is one that is done under established state procedures, regulations, or statutes.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982); *Reed v. Miguel*, Case No. 1:20-cv-00121-JLT (PC), 2020 WL 2306875, at *3 (E.D. Cal. May 8, 2020) (citation omitted).  "Ordinarily, due process of law requires notice and an opportunity for some kind of hearing prior to the deprivation of a . . . property interest."  *Halverson v. Skagit County*, 42 F.3d 1257, 1260 (9th Cir.1994), *as amended* (Feb. 9, 1995) (brackets and citation omitted).  Authorized deprivations of property are permissible if carried out pursuant to a regulation that is reasonably related to a legitimate governmental interest.  *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

First, when he entered the work furlough program, D'Agirbaud signed a "furlough contract" in which he agreed to "pay 25% of ALL WAGES" for any court-ordered restitution and/or Crime Victim Compensation fees.  Ex. C, ECF No. 1-4 at 2–3.  He agreed to (1) open an account with BOH within thirty days of employment; and (2) submit his pay stubs to case managers to calculate the amount he owed and authorize deductions in that amount.  *Id.*  He acknowledged that a failure to comply with these conditions would result in disciplinary action and/or transfer to more restrictive housing.  Clearly, D'Agirbaud had notice of the amount

his deductions would be, that prison officials could authorize deductions from his account, and the consequences of refusing to allow such deductions.

Second, D'Agirbaud had an opportunity to object before he entered the work furlough contract, although this would negate his work furlough participation.  He also had an opportunity to be heard when he notified DPS officials through letters and grievances, the Ombudsman, the Crime Victim Compensation Commission, the Office of the Attorney General, the BOH Fraud Department, the state courts, the HPA, and HPD.  *See generally id.* at 8–31.

Third, as D'Agirbaud was informed repeatedly, HRS § 353-17(a) authorizes the DPS Director or his agent to require that "any moneys earned from employment" by an inmate on a work furlough program, "be used to satisfy a restitution order and to reimburse the State for the cost of room and board."  The Director also has the full authority to set the percentage to be deducted.  HRS § 353-17(b).  This statute explicitly applies to work furlough employment; D'Agirbaud's obstinate reliance on § 353-22.6 in support of his argument is misplaced.  And, D'Agirbaud's judgment in Cr. No. 02-1-1336 (Haw. 1st Cir. Ct.) authorizes "*at least* 10%" of his expendable income to be deducted for restitution. Ex. C, ECF No. 1-4 at 6 (emphasis added).  It does not stipulate *that no more* than 10% may be deducted; thus 25% is allowed.  Under the statute and the terms of his

sentence, DPS had the authority to withdraw funds from D'Agirbaud's wages for restitution.[20]

Fourth, the Ninth Circuit has upheld a similar California statute, that requires the Director of the California Department of Corrections and Rehabilitation to make deductions from prisoner wage and trust account deposits for payment of restitution obligations, finding it is rationally related to legitimate state interests in compensating crime victims.  *See Craft v. Ahuja*, 475 F. App'x 649, 650 (9th Cir. 2012) (citation omitted); *see also Abney v. Alameida*, 334 F. Supp. 2d 1221, 1232 (S.D. Cal. 2004) ("Plaintiff has not, and cannot, allege that the deduction of money to satisfy the victim restitution order is not a legitimate interest of the State of California."); *Kibunguchy v. Shnider*, No. 2:20-cv-0495 DB P, 2020 WL 2216564, at *2 (E.D. Cal. May 7, 2020) (citations omitted).

D'Agirbaud fails to state a colorable claim for the denial of due process or supporting an allegation that Defendants withdrew his funds without authorization. *See* Ex. C, ECF No. 1-4 at 23 (State of Hawaii Official Receipt, showing receipt of restitution funds).

---

[20]  It is immaterial that D'Agirbaud is correct that such deductions from work furlough income are not authorized under HRS § 353-22.6; the deductions are permitted by HRS § 353-17.

### E.      Retaliation

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote and citations omitted).  A "[p]laintiff must establish a nexus between the . . . retaliatory act and the protected activity."  *See Grenning v. Klemme*, 34 F. Supp.3d 1144, 1153 (E.D. Wash. 2014) (citation omitted).

A connection between the alleged retaliation and protected conduct can be shown by a chronology of events from which retaliation can be inferred.  *See Watison*, 688 F.3d at 1114 (citations omitted).  The plaintiff must also allege either a chilling effect on future First Amendment activities, or that he suffered some other "more than minimal" harm.  *Id.* (quoting *Rhodes*, 408 F.3d at 567–68 n.11).  The plaintiff need not "show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary

firmness from future First Amendment activities.'" *Brodheim*, 584 F.3d at 1271 (emphasis omitted) (quoting *Rhodes*, 408 F.3d at 568–69). A plaintiff successfully pleads that the action did not reasonably advance a legitimate correctional goal by alleging, in addition to a retaliatory motive, that the defendant's actions were "arbitrary and capricious" or that they were "unnecessary to the maintenance of order in the institution." *Watison*, 668 F.3d at 1115 (citations omitted).

Finally, preserving institutional order, discipline, and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation. *See Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (citation omitted); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (citations omitted). Courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin*, 515 U.S. at 482). A plaintiff must prove that the alleged retaliatory motive was the but-for cause of the challenged actions. *See Hartman v. Moore*, 547 U.S. 250, 260 (2006).

### 1.    Count III:  Defendants Kam and Sakamoto

D'Agirbaud alleges that Sergeants Kam and Sakamoto retaliated against him when Kam issued an allegedly false misconduct report, Sakamoto moved him to a

new cell and removed him from his job on Kam's orders, and Kam moved him to the SHU.  First, D'Agirbaud does not allege *any* protected conduct in which he engaged that initiated this alleged retaliation or how these Defendants were made aware of this conduct.[21]

Second, Sakamoto's only involvement in this claim is removing D'Agirbaud from his position as a "floor-boy" and moving him to different cells on instructions from Kam and pursuant to his misconduct charge.  This chronology fails to support an inference that their actions were retaliatory or show that there was no legitimate penological reason for their actions.

Third, D'Agirbaud admits that he revealed his cell mate's sex offender status to other inmates during and after the alleged assault.  Although he disputes that his statements constitute threats, the charge was not false.  Regardless of D'Agirbaud's perception of his statements, prison officials determined that his conduct caused a safety issue at the prison.  Kam's actions were related to a legitimate correctional goal:  maintaining order and security in the prison.  D'Agirbaud cannot show that Kam's actions were arbitrary or capricious, or the "but-for" reason for the misconduct charge.

---

[21]  To the extent D'Agirbaud alleges that revealing his cell mate's sexual offender status was protected conduct, it is unclear how this qualifies as petitioning the government for redress of grievances.

D'Agirbaud fails to state a colorable retaliation claim in Count III against Sergeants Kam and Sakamoto.

### 2.      Counts VI and VII

D'Agirbaud alleges that OCCC Defendants Sequeira, Keliihoomalu, Ashby, and Yoda, and DPS Defendant Lortz retaliated against him for challenging the DPS policy of withholding 25% of his work furlough income by removing him from the program and transferring him back to HCF.  *See* Compl., ECF No. 1 at 15 (Count VI).  He further alleges that they and OCCC Defendant Kaili withdrew restitution payments from his account in retaliation for his refusal to make such payments.  *Id.* at16 (Count VII).

These allegations contradict the facts alleged in the Complaint.  D'Agirbaud admits that he refused to make restitution payments after he had agreed to this condition and signed his consent in the furlough contract.  In response, he was removed from the work furlough program and four restitution payments were deducted from his account by prison officials who have the authority to do so.  This does not support a but-for motivation or an arbitrary and capricious action.  Rather, it shows the imposition of a known consequence for violating the terms of the work furlough program.  These actions clearly promote legitimate penological goals of maintaining order and discipline in the facility and in the work furlough program.

D'Agirbaud's conclusory allegations of retaliation regarding his transfer to HCF are contradicted by his own statement of facts and exhibits in support.  First, D'Agirbaud submits evidence showing that he was given leeway on an incident with another inmate at OCCC, when both inmates signed a "Behavioral Contract" in lieu of being transferred to restricted housing.  *See* Ex. B., ECF No. 1-3 at 2. When two inmates later reported on March 28, 2019 that he had sexually harassed and threatened one of them, however, he was charged, a hearing was held, and he was found guilty.  *Id.* at 3–5.  On the basis of the incidents reported on March 28, 2019, D'Agirbaud was upgraded to medium custody and he was transferred back to HCF.  *See id.* at 7.

Again, D'Agirbaud makes no allegation of any chilling effect as a result of this transfer.  In light of his history at OCCC, including his refusal to comply with the dictates of his work furlough contract, the change in custody, misconduct proceedings, and transfer to HCF do not appear arbitrary, capricious, or unrelated to legitimate penological goals.  Although a closer call, D'Agirbaud fails to allege sufficient facts to state a retaliation claim against OCCC Defendants regarding his transfer to HCF.

## F.      Conspiracy under 42 U.S.C. § 1983

"Conspiracy is not itself a constitutional tort under § 1983." *Lacey v.*

*Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012) (citations omitted).  Thus,

conclusory allegations of a conspiracy are insufficient, and standing alone they fail

to state a valid § 1983 claim.  *See Burns v. County of King*, 883 F.2d 819, 821 (9th

Cir. 1989) (per curiam).  To state a conspiracy claim under § 1983, a plaintiff must

allege specific facts showing that two or more persons intended to accomplish an

unlawful objective of causing him harm and took some concerted action in

furtherance of that goal.  *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57

(9th Cir. 1999).  That is, a plaintiff "must show 'an agreement or "meeting of the

minds" to violate constitutional rights.'"  *Hart v. Parks*, 450 F.3d 1059, 1069 (9th

Cir. 2006) (quoting *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002)).

D'Agirbaud's conclusory allegations of a conspiracy, without any factual

support, are insufficient to state a claim.  "[A]llegation[s] of parallel conduct and a

bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.

Plaintiff's conspiracy claims represent only the "mere possibility of misconduct" or

an "unadorned, the-defendant-unlawfully-harmed-me accusation," and therefore fall

short of meeting any plausibility standard.  *Iqbal*, 556 U.S. at 678–79 (citations

omitted).

## IV.  **LEAVE TO AMEND**

The Complaint is DISMISSED with leave granted to amend consistent with this Order on or before July 20, 2020.  The amended pleading must cure the deficiencies discussed herein.  D'Agirbaud must present his claims in two separate actions to comply with Fed. R. Civ. P. 18 and 20.  He may not expand his claims beyond those already alleged or add new claims, however, without explaining how those new claims relate to the claims alleged in the original Complaint.

An amended pleading and any new complaint must be submitted on the court's prisoner civil rights form.  An amended complaint will supersede the preceding complaint.  *See Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (citations omitted); LR 99.7.10.  Defendants not renamed and claims not realleged in an amended complaint will be deemed voluntarily dismissed.  *See Lacey*, 693 F.3d at 928.  If D'Agirbaud fails to file an amended complaint that cures the deficiencies in his claims, this action may be automatically dismissed and may count as a "strike" under 28 U.S.C. § 1915(g).[22]

---

[22] 28 U.S.C. § 1915(g) bars a civil action by a prisoner proceeding in forma pauperis:

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the
> (continued...)

# V. **CONCLUSION**

(1)  The Complaint is DISMISSED in its entirety WITH LEAVE GRANTED

TO AMEND, pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b)(1) for failure to

state a plausible claim for relieve under Rule 8(a) or comply with Rules 18(a) and

20(a)(2) of the Federal Rules of Civil Procedure regarding permissive joinder of

parties and claims.  This dismissal allows D'Agirbaud to determine which *related*

claims he will pursue in *this* action, which claims he will bring in a *new* action, and

which claims he may forgo with the benefit of the Court's analysis of his claims.

(2)  Claims alleged against DPS and all official capacity Defendants seeking

prospective injunctive relief and damages are DISMISSED with prejudice.

(3)  Claims alleged under the Eighth Amendment in Counts I and II, against

Defendants Kaplan, Lee-Zidek, Warden Harrington, and Kam for an alleged failure

to protect him from sexual assault are DISMISSED with leave granted to amend.

(4)  Claims alleged under the Eighth Amendment in Count IV against

Defendant Kam for failing to provide D'Agirbaud immediate medical care after the

alleged assault may proceed as alleged in an amended pleading.  Claims alleged

---

[22](...continued)

> grounds that it is frivolous, malicious, or fails to state a claim
> upon which relief may be granted, unless the prisoner is under
> imminent danger of serious physical injury.

against Warden Harrington for failure to provide medical care fail to state a claim and are DISMISSED with leave to amend.

(5)  Claims alleged under the First Amendment in Count III, for retaliation regarding Kam's allegedly false charges that D'Agirbaud refused to change cells, fail to state a claim and are DISMISSED with leave to amend.

(6)  Claims alleged under the First, Eighth, and Fourteenth Amendments in Counts V, VI, and VII, regarding D'Agirbaud's removal from the work furlough program, transfer to HCF, and the alleged denial of due process during misconduct proceedings at OCCC and HCF are DISMISSED with leave granted to amend.

(7)  D'Agirbaud may file an amended pleading in **this** action that complies with this Court's instructions on or before July 20, 2020.  Plaintiff may assert claims unrelated to those asserted herein by commencing a new action in the normal course.

(8)  D'Agirbaud is NOTIFIED that failure to file an amended pleading that cures the deficiencies in his claims and fully complies with the Federal and Local Rules of Civil Procedure shall result in dismissal of this action without further notice and he will incur a strike pursuant to 28 U.S.C. § 1915(g).

(9)  The Clerk is DIRECTED to send D'Agirbaud two prisoner civil rights complaint forms so that he can comply with the directions of this Order if he elects to file an amended complaint and a second suit.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, June 16, 2020.



Jill A. Otake
United States District Judge

*D'Agirbaud v. Kam, et al.*, Civil No 20-00139 JAO-KJM; Order Dismissing Complaint with Leave to Amend; Scrg '20 (imp. jndr FRCP 18 & 20; dny med., fail prot.; DP; retal; consp)